EXHIBIT 1

TO

VERIFIED COMPLAINT *IN REM*

DECLARATION OF JESSE PILOTE

# DECLARATION OF JESSE PILOTE

# IN SUPPORT OF COMPLAINT

I, Jesse Pilote, provide the following information under the penalty of perjury, as provided by 28 U.S.C. § 1746, and declare that the following is true and correct to the best of my knowledge, information and belief.

## A. Declarant's Background

1. I am a Task Force Officer ("TFO") with the Drug Enforcement Administration ("DEA") assigned to the Metropolitan Nashville Airport Police Department in Nashville, Tennessee. I have been a TFO since July 2009. During my tenure as a DEA TFO, I have been involved in hundreds of narcotics and drug-related investigations involving violations of international, federal, and state narcotics laws. I have authored and executed numerous federal and state search warrants and authored numerous federal and state affidavits for authorization for the interception of wire communications. The federal crimes I am assigned to investigate include but are not limited to violations of 21 U.S.C. §§ 841 and 846 and 18 U.S.C. §§ 1956 & 1957.

## B. Items Sought for Forfeiture

2. Pursuant to 21 U.S.C. § 881(a)(6), the United States seeks the forfeiture of $32,904 United States currency ("Defendant Property") because it is monies furnished or intended to be furnished in exchange for a controlled substance or proceeds traceable to such an exchange, or monies used or intended to facilitate drug trafficking in violation of 21 U.S.C. §§ 801 *et seq*.

## C. Basis of Information

3. The information in this Declaration was obtained through my personal observations, training and experience, information gathered during interviews of and

conversations with civilians and other law enforcement officers, and written reports and investigations conducted by other law enforcement officers. I have not included all information known to me concerning the facts surrounding this Declaration, but only those required to show that there is a reasonable belief that Defendant Property is subject to forfeiture.

**D.     Facts**

   *a. Background on Flores and connection to ongoing DEA investigation*

4.     On March 16, 2023, DEA Nashville Task Force Group 2 received a tip that Fernando Flores ("Flores") was traveling from Nashville, Tennessee ("BNA") to Los Angeles California ("LAX"). Based upon my training and experience, Los Angeles is a known narcotics source city.

5.     Flores booked his one-way flight the night prior. Flores' travel history shows a pattern of one-way flights to and from LAX, a known source city, and BNA. Based on my training and experience, this pattern is consistent with drug trafficking activity. Drug traffickers and money mules usually book travel last minute and in one-way flights to make it difficult for law enforcement to track their movements.

6.     According to the Narcotics and Dangerous Drugs Information System, Flores is a suspect in an active DEA investigation. He is a suspected source of illegal narcotics supply and involved in CashApp transactions with other individuals acting as money mules or other sources of supply.

7.     A criminal history check via the National Crime Information Center revealed Flores was arrested in 2008 for Possession of a Controlled Substance and in 2009 for Possession and Transportation of a Controlled Substance in California.

### b. *Law enforcement encounter with Flores*

8. Flores' flight was scheduled to depart BNA on March 16, 2023, at 2:15 p.m., via Southwest Airlines. Records indicated that Flores did not check any luggage for the flight.

9. At approximately 1:50 p.m., Metropolitan Nashville Airport Authority ("MNAA") Detectives Chris Lueders ("Det. Lueders"), Brad Kessler ("Det. Kessler") and Chris Swisher ("Det. Swisher") observed Flores at Gate C25. Investigators observed that Flores was in possession of a green backpack and a black shoulder bag.

10. Det. Kessler approached Flores and identified himself as a law enforcement officer. Investigators advised Flores of their duties at BNA and asked Flores if he would speak with them. Flores stated that he would. Investigators explained to Flores that he was not being detained or under arrest and he was free to leave at any time.

11. Investigators asked Flores if there were any narcotics in the green backpack or the black shoulder bag. Flores stated there was not and consented to a search the bags.

12. Det. Lueders and Det. Swisher searched the green backpack and black shoulder bag and found numerous stacks of loose United States currency ("U.S. currency"), concealed within various zipper pockets inside the green backpack. Additionally, U.S. currency was discovered within a tan zipper pouch inside the black shoulder bag.

13. Investigators asked Flores how much U.S. currency was in his possession, and Flores stated "$8,000." Based upon the experience of the investigators the U.S. currency appeared to be much more than $8,000. Investigators asked Flores if he would accompany investigators to the DEA's airport office to discuss the U.S. currency. Flores agreed.

### c. Flores' evolving stories

14. At approximately 2:00 p.m., investigators and Flores arrived at the DEA office. Investigators informed Flores again that he was not under arrest or being detained and was free to leave at any time. Det. Lueders and Det. Swisher opened Flores' green backpack and black shoulder bag, then placed the concealed U.S. currency on a nearby table which could be viewed by Flores.

15. I asked how much U.S. currency was in his possession. Flores stated that he thought it was around $20,000.

16. I asked Flores what he did for a living and Flores stated that:

   a. he owned a construction company;

   b. he was also in real estate;

   c. he had been in Nashville for approximately one week,

   d. he stayed at the Hampton Inn in Green Hills;

   e. he booked his flight back home the day before;

   f. he was looking at real estate on Broadway to open a Hibachi restaurant;

   g. he was traveling by himself; and

   h. his last trip was a week prior in Mexico to visit family.

17. During the interview, Flores changed his story and stated that he was in Nashville to purchase a car. He claimed he was looking to purchase a Honda or Nissan Maxima.

18. Flores could not provide any listing, text messages, or documentation of any kind regarding the properties that he was interested in renting on Broadway nor any listings for vehicles that he was wanting to purchase. Flores provided a business card for Brookside

5

Properties Executive Vice President, David P. Crabtree ("Mr. Crabtree") and stated that he was working with Mr. Crabtree to obtain the properties.

19. On the back of Mr. Crabtree's card there were two handwritten addresses: "905 Buchannan (Near Slim and Huskey's)" and "1003 Buchannan". Investigators looked the addresses up. 905 Buchannan is a closed coffee shop and small independent building. 1003 Buchannan is a small complex that includes a barber shop and various businesses. Neither of these addresses is near Broadway in Nashville.

20. A United States Marshal Service Deputy, as part of a subsequent investigation, interviewed Mr. Crabtree. Mr. Crabtree denied working with anyone named Flores on purchasing any type of property in Nashville.

21. I asked Flores about his criminal history. Flores stated that he had no major criminal offenses but had been arrested for trespassing. Flores offered that he had money seized from him by the Indiana State Police during a traffic stop in 2021.

22. Flores stated that the U.S. currency was not withdrawn from a bank. He said it was from saving cash payments from his businesses. Flores stated that he is mostly paid in cash and does not utilize a bank very often. Based upon my training and experience, drug traffickers and money mules often deal in cash to make their transactions more difficult for law enforcement to trace.

23. Flores also stated that he did not have online banking access to show investigators account activity. At first, Flores stated that he claimed $80,000 in income on his 2021 taxes, but later stated that he claimed $180,000.

24. Flores could not provide any documentation on legitimate income.

### d. *Positive alert to the U.S. currency by a drug detection K-9*

25. Det. Lueders placed the U.S. currency recovered from the green backpack and black shoulder bag in controlled environment. Det. Lueders introduced his trained, reliable narcotics detection K-9 "Power" to the array of boxes. Power indicated a positive alert for the odor of narcotics on the box containing the U.S. currency.

26. I asked Flores if he could provide any other proof of his travel or income he may have on his phone. Flores could not produce any further documentation. Flores declined consent to search his cell phone.

27. Upon transferring the U.S. currency to Loomis for an official count, it was further determined to be $32,904 U.S. currency.

### E. Conclusion

28. Based on the foregoing, my experience and training, and the facts of this investigation, facts support a reasonable belief that the Defendant Property was furnished or intended to be furnished in exchange for a controlled substance or proceeds traceable to such an exchange, or monies used or intended to facilitate a violation of 21 U.S.C. §§ 801 *et seq*. The Defendant Property is, therefore, forfeitable to the United States pursuant to 21 U.S.C. § 881(a)(6).

9/5/2023

Jesse Pilote, Task Force Officer
Drug Enforcement Administration